******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CAROLYN COLEMAN *v.* MARTIN BEMBRIDGE
(AC 42669)

Alvord, Moll and Cradle, Js.

*Syllabus*

The plaintiff appealed to this court from the judgment of the trial court dissolving her marriage to the defendant. The trial court ordered that the parties' minor child would maintain a primary residence with the plaintiff in Connecticut until the child's second birthday. At that time, the child's residence would begin to alternate, so that he would spend one half of each year with the plaintiff and one half with the defendant, who lived in Saskatchewan, Canada. In the event that the parties were unable to agree on a custody schedule, the trial court ordered that the child would spend two months at a time with each party. The trial court further ordered that, following the child's fifth or sixth birthday, he would be enrolled in a full-time academic program in Connecticut and would again maintain a primary residence with the plaintiff. *Held*:

1. The trial court's physical custody orders did not modify the physical custody of the child prospectively and were not improper: the substance of the trial court's orders reflected that it intended the parties to maintain joint physical custody of the child at all times; moreover, the trial court's order requiring changes to the child's residence did not alter the nature of the joint physical custody award and, accordingly, did not require future modifications to the child's physical custody.

2. The plaintiff could not prevail on her claim that, to the extent the trial court awarded the parties joint physical custody, it lacked the statutory authority to do so and deprived the plaintiff of her due process rights: the trial court had the authority to award the parties joint physical custody notwithstanding that both parties sought only sole physical custody, as the applicable statute (§ 46b-56a) restricted the court's authority to award joint legal custody, not joint physical custody; moreover, the plaintiff failed to demonstrate that she lacked fair notice and a reasonable opportunity to be heard with respect to the trial court's award of joint physical custody, as she had requested broad relief and had the opportunity at trial to testify, to elicit testimony from a family relations counselor, to cross-examine the defendant, and to offer exhibits into evidence; accordingly, the trial court did not infringe on her due process rights.

3. The trial court did not abuse its discretion in entering the physical custody orders: the findings on which the orders were predicated, including the trial court's determination that the plaintiff was unlikely to foster a relationship between the defendant and the child without court orders, were based on substantial evidence; moreover, the physical custody orders did not hinder the plaintiff's ability to exercise the decision-making authority granted to her with respect to the legal custody orders; furthermore, the trial court determined that the physical custody orders it constructed were in the child's best interest in light of the child's young age and the large geographical distance between the parties' residences.

Argued May 20—officially released August 31, 2021

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven and tried to the court, *K. Murphy, J.*; judgment dissolving the marriage and granting certain other relief, from which the plaintiff appealed to this court. *Affirmed.*

*Sarah E. Murray*, for the appellant (plaintiff).

*Campbell D. Barrett*, with whom was *Johanna S.*

*Katz*, for the appellee (defendant).

*Opinion*

MOLL, J. In this dissolution matter, the plaintiff, Carolyn Coleman, appeals from the judgment of dissolution rendered by the trial court insofar as the court entered orders regarding the physical custody of the parties' minor child. On appeal, the plaintiff claims that (1) the court improperly modified the child's physical custody prospectively, (2) to the extent that it awarded the parties joint physical custody, the court (a) acted beyond its statutory authority and (b) violated the plaintiff's due process rights when neither she nor the defendant, Martin Bembridge, requested joint physical custody, and (3) the court abused its discretion in entering physical custody orders that were (a) predicated on inconsistent factual findings, (b) incompatible with the court's legal custody orders, and (c) not in the child's best interests. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. "The parties met through the social media website Twitter in April, 2015. After speaking on the phone, the couple eventually physically met in May, 2015. The plaintiff was living in Meriden . . . and the defendant lived in Saskatchewan, Canada. Shortly thereafter, in July, 2015, the defendant proposed marriage and the plaintiff accepted.

"The parties were married in Portland . . . on October 8, 2016. Following the date of their marriage, the two lived apart with the plaintiff continuing to live in Connecticut and the defendant continuing to live in Saskatchewan. They physically met on a few occasions before the plaintiff relocated on July 28, 2017, to Saskatchewan to live with the defendant. The parties' child was conceived approximately the first or second day after [the plaintiff] arrived in Canada. By the end of August, 2017, the plaintiff discovered that she was pregnant. In the middle of September, [2017], the plaintiff informed the defendant that she did not find him attractive, did not love him, and wanted to end the marriage. By October 18, 2017, the plaintiff moved back to Connecticut and has resided in Meriden . . . in her father's house since that time. The parties' son . . . was born [in April, 2018]."

In February, 2018, the plaintiff commenced the present dissolution action. On May 8, 2018, following the birth of the parties' son, the plaintiff filed an amended complaint in which she requested sole legal custody and that the child's primary residence remain with her. Additionally, in the amended complaint, the plaintiff requested as relief "anything else the court deems fair."

The matter was tried to the trial court, *K. Murphy, J.*, over the course of three days in January, 2019. Prior to trial, each party submitted proposed orders. In her

proposed orders, the plaintiff requested in relevant part (1) sole custody and (2) "[a]ll such other and further relief both in law and in equity to which the court deems appropriate." In his proposed orders, the defendant requested in relevant part joint legal custody and that the child's primary residence be with him, with the plaintiff enjoying "reasonable and liberal parenting time . . . ."

On February 15, 2019, the court issued a memorandum of decision dissolving the parties' marriage. As to custody, the court stated that "[w]eighing all of the evidence and balancing the interests of the parties has been difficult in this situation. The court's primary objective is the best interest of the parties' son . . . ." The court continued in relevant part: "The court is awarding joint custody to both parties. Primary residence of the child initially shall be with the [plaintiff]. Throughout the child's life the parties are directed to discuss and work together in order to obtain agreement in regard to all major decisions, which includes decisions relating to health care and education. If after discussion and providing full information regarding the decision at issue the parties have not reached agreement, [the plaintiff] will have final decision-making authority. All other decisions of a 'nonmajor' nature shall be made by the parent with whom the child is residing at the time. If that decision involves an emergency health decision involving the child, the deciding parent should inform the other parent immediately but in the very most within twenty-four hours of being aware of the emergency."

With respect to the child's physical residence, the court ordered as follows. Prior to the child's second birthday, his primary physical residence will be with the plaintiff, subject to the defendant having one week of unsupervised visitation each month in Connecticut. On the child's second birthday, the child's physical residence will begin to alternate between the parties. This arrangement will continue either until the start of the academic school year following the child's fifth birthday or, if he is not ready to enroll in a full-time academic program at that time, until the start of the academic school year following the child's sixth birthday. The parties are to agree in writing on a schedule that "will approximately allow the equal custody of the child by both parties for the three to four plus years" leading up to the child's enrollment in school, but, if the parties cannot reach an agreement, then the parties are to abide by a default schedule created by the court pursuant to which, beginning on May 1, 2020, the child's physical residence alternates between the parties approximately every two months. On the child's enrollment in school following either his fifth or sixth birthday, his primary physical residence will revert back to the plaintiff, with the defendant having one week of unsupervised visitation each month; during such visitation the defendant

will be responsible for ensuring that the child attends school. Additionally, "[f]ollowing the commencement of full-time school when the child has a week or more off during the school year, [the defendant] will be entitled to one week of uninterrupted parenting time during the school year and one week of uninterrupted parenting time during the Christmas break with the child at whatever location is convenient for [the defendant] and the child. During the summer break, the [defendant] is entitled to approximately two-thirds of that time when the child will physically reside with the [defendant]. [The plaintiff] will be entitled to approximately one-third of that summer break time." The court further ordered that each party will be allowed two thirty minute virtual visits per week when physically away from the child.[1] This appeal followed.[2] Additional facts and procedural history will be set forth as necessary.

Before turning to the plaintiff's claims, "we set forth our standard of review. [T]he standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 111–12, 89 A.3d 896 (2014).

I

The plaintiff first claims that the trial court's physical custody orders[3] are improper because they modify the physical custody of the child prospectively. Specifically, the plaintiff contends that the physical custody orders "provide for automatic wholesale changes based solely upon the child's age" without real time determinations of the child's best interests. The defendant argues that the physical custody orders do not result in prospective modifications of custody but, rather, create a permissible "tiered custodial plan" based on the present best interests of the child. We agree with the defendant.

As we previously set forth in this opinion, "[o]ur deferential standard of review [in domestic relations cases]

. . . does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal. . . . Moreover, [t]he construction of [an order or] judgment is a question of law for the court . . . [and] our review . . . is plenary. As a general rule, [orders and] judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the [order or] judgment." (Citation omitted; internal quotation marks omitted.) *Marshall* v. *Marshall*, 200 Conn. App. 688, 717, 241 A.3d 189 (2020).

Our precedent instructs that a trial court may not prospectively modify a custody order because, when contemplating whether to modify custody, a court must consider the real time best interests of the child. In *Guss* v. *Guss*, 1 Conn. App. 356, 472 A.2d 790 (1984), in dissolving the parties' marriage, the trial court awarded sole custody of the parties' two minor children to the defendant, subject to the plaintiff's rights to visitation. Id., 357–58. Thereafter, the parties executed a postjudgment stipulation agreeing to modify the terms of the dissolution judgment, inter alia, to provide that it was in the best interests of the children for the plaintiff to be automatically awarded sole custody in the event that the defendant removed the children from Connecticut. Id., 358. The court approved the stipulation and modified the dissolution judgment in accordance therewith. Id. Subsequently, the defendant moved to California with the children. Id. After being notified by the plaintiff of the defendant's relocation, the court, without holding a hearing to determine the children's best interests, issued an order transferring sole custody to the plaintiff. Id., 358–59.

On appeal, this court set aside the custody modification order. Id., 360–61, 363. This court observed that "[u]nder [General Statutes § 46b-56 (b)], it is clear that the [trial] court must resolve the issue of custody in the best interests of the child. . . . When, as in this case, the court is called upon to apply an agreement deciding custody, the dispositive consideration still remains the child's best interests." (Citation omitted; footnote omitted.) Id., 360. This court concluded that "[t]here was no determination, other than at the time the judgment of dissolution was modified in accordance with the stipulation, that enforcement of the agreement would serve the best interests of the children. A child's best interests, however, cannot be prospectively determined. Before transferring custody to the plaintiff, the [trial] court was bound to consider the child[ren's] *present* best interests and not what would have been in [their] best interests at some previous time." (Emphasis in original; internal quotation marks omitted.) Id., 360–61.

In *Emerick* v. *Emerick*, 5 Conn. App. 649, 502 A.2d

933 (1985), cert. dismissed, 200 Conn. 804, 510 A.2d 192 (1986), the trial court, in rendering a dissolution judgment, ordered that the plaintiff would have "interim custody" of the parties' minor child and that, on the satisfaction of certain conditions, the parties would be awarded joint custody approximately one and one-half years after the dissolution judgment. Id., 652. In addition, the court ordered that " '[i]n the event of . . . a [permanent] removal [of the child from Connecticut by either party], custody, without further order . . . shall vest immediately and solely in the remaining parent.' " Id., 652–53, 653 n.3. On appeal from the dissolution judgment, this court, citing *Guss*, concluded that the trial court's order providing for the automatic shifting of custody was improper, reasoning that "[t]he paramount concern in awarding custody is the best interest of the child. . . . A child's best interests, however, cannot be prospectively determined. . . . The judicial hands of a future court cannot be bound by an earlier court's determination that the best interests of a child as to custody remain constant. A transfer of custody cannot be automatically accomplished upon the happening of a future event, in this case, removal of the child from Connecticut." (Citations omitted; internal quotation marks omitted.) Id., 659.

The plaintiff contends that the court violated the principles enunciated in *Guss* and *Emerick*[4] by ordering that physical custody of the parties' child automatically changes, without real time determinations of the child's best interests, (1) following the child's second birthday, when primary residence with the plaintiff changes to an alternating residences arrangement, and (2) following the child's fifth or sixth birthday, depending on his capability to enter a full-time academic program, when the alternating residences arrangement returns to primary residence with the plaintiff. The plaintiff's reliance on these cases is misplaced, however, because we reject the plaintiff's foundational premise that the court's physical custody orders result in future modifications of the child's physical custody. Instead, under the court's orders, no parent has sole physical custody of the child; rather, the child benefits from parenting by each of his parents, under the circumstances of this case, by alternating between his parents' residences.

In its decision, the court awarded the parties "joint custody." General Statutes § 46b-56a (a) defines " 'joint custody' " as "an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. . . ." This court has interpreted the statutory definition of "joint custody" to encompass "joint legal custody, meaning joint decision making, and joint physical custody, meaning a sharing of continued contact with both parents." *Emerick* v. *Emerick*, supra, 5 Conn.

App. 656. Thus, on its face, the court's award of "joint custody" indicates an award of both joint legal custody *and* joint physical custody.

We recognize that, alone, the court's use of the phrase "joint custody" does not demonstrate per se that the parties were awarded joint physical custody. See *Blake* v. *Blake*, 207 Conn. 217, 221, 223, 541 A.2d 1201 (1988) (in light of other provisions ordered by trial court regarding custody, including that children would " 'reside primarily' " with plaintiff and that plaintiff was permitted to move children to California to live, court's use of phrase "joint custody" in its decision implied that court awarded parties joint legal custody but not joint physical custody). The substance of the court's physical custody orders, however, reflects that the court intended the parties to maintain joint physical custody of their child at all relevant times. That the court ordered the child's residential custody to change from primary residence with the plaintiff to an alternating residences arrangement and then back to primary residence with the plaintiff does not alter the nature of the joint physical custody award. "It is common for a joint-custody order to provide that the child will reside 'primarily' with one of the parents. It is also common to devise a schedule alternating the days, weeks, months or other blocks of time which the child will spend with each parent." A. Rutkin et al., 8 Connecticut Practice Series: Family Law and Practice with Forms (3d Ed. 2010) § 42:9, pp. 519–20. Put simply, we interpret the physical custody orders as assigning the parties joint physical custody—that is, "a sharing of continued contact with both parents"; *Emerick* v. *Emerick*, supra, 5 Conn. App. 656;—throughout the course of the child's minority, with a unique, fluid residential arrangement devised to promote the child's best interests and intended, as the court explained, "to deal with a difficult situation [in which] the parents of a young child live in two very different and geographically diverse places . . . ."[5] Under the physical custody orders, at no point is the court's order of joint physical custody ever changed into sole physical custody by one parent. Cf. *Emerick* v. *Emerick*, supra, 5 Conn. App. 652, 659 (improper prospective modification changing custody); *Guss* v. *Guss*, supra, 1 Conn. App. 358, 360–61 (same). Rather, the court determined that it was in the best interests of the child for his residential custody to alternate between his parents.

In sum, we conclude that the court's physical custody orders, taken together, carry out an award of joint physical custody. The orders do not bring about future modifications of the child's physical custody, and, therefore, we reject the plaintiff's claim that the court improperly modified the child's physical custody prospectively.

## II

The plaintiff next claims that, insofar as the court

awarded the parties joint physical custody, the court did so (1) without statutory authority and (2) without providing the plaintiff with fair notice and an opportunity to be heard, thereby depriving her of due process. We address each claim in turn.

A

The plaintiff asserts that the court lacked statutory authority to award the parties joint physical custody. Specifically, the plaintiff contends that, pursuant to § 46b-56a, the court had the authority to award the parties joint physical custody only if they had agreed to joint physical custody or if one of the parties had requested it. The plaintiff asserts that she and the defendant both requested sole physical custody, and, thus, the court acted beyond its statutory authority in awarding them joint physical custody. The defendant argues that the plaintiff conflates joint physical custody with joint legal custody and that there is no legal authority mandating an agreement by the parties or a request by one of the parties as a prerequisite to a joint physical custody award. We agree with the defendant.

Resolution of the plaintiff's claim requires us to employ the relevant principles of statutory construction. "Issues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *O'Toole* v. *Hernandez*, 163 Conn. App. 565, 571–72, 137 A.3d 52, cert. denied, 320 Conn. 934, 134 A.3d 623 (2016).

Section 46b-56 (a) provides in relevant part: "In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may make or modify any proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction under the provisions of chapter 815p. Subject to the provisions of section

46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. . . ."

Section 46b-56a provides in relevant part: "(a) For the purposes of this section, 'joint custody' means an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. The court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody.

"(b) There shall be a presumption, affecting the burden of proof, that joint custody is in the best interests of a minor child where the parents have agreed to an award of joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child or children of the marriage. . . .

"(c) If only one parent seeks an order of joint custody upon a motion duly made, the court may order both parties to submit to conciliation at their own expense with the costs of such conciliation to be borne by the parties as the court directs according to each party's ability to pay. . . ."

This court previously has addressed the question of whether a trial court has the statutory authority to award joint custody without the parties agreeing to joint custody or one of the parties requesting the same. In *Emerick* v. *Emerick*, supra, 5 Conn. App. 649, on appeal from a dissolution judgment, the plaintiff challenged the trial court's prospective joint custody award, inter alia, on the basis that neither party had agreed to or sought joint custody. Id., 653. This court interpreted "joint custody," as set forth in § 46b-56a (a), "as including joint legal custody, meaning joint decision making, and joint physical custody, meaning a sharing of continued contact with both parents. Further, joint physical custody is severable from joint legal custody." Id., 656–57. This court then construed § 46b-56a to provide that "[a] court may award joint legal custody, with or without joint physical custody, if the parties agree to joint custody or if one party seeks joint custody." Id., 657. This court observed that (1) § 46b-56a (b) establishes a presumption that joint custody is in the child's best interests if the parties have agreed to joint custody, and the statute does not provide that joint custody may be awarded in the absence of an agreement, and (2) § 46b-56a (c) permits a trial court to order parties to submit to conciliation when one party moves for joint custody, and § 46b-56a (b) authorizes the court to award joint custody once the recalcitrant party, following concilia-

tion, agrees to joint custody. Id., 657–58. This court reasoned that § 46b-56a, "read as a whole, reflects a legislative belief that joint custody cannot work unless both parties are united in its purposes. Therefore, joint custody cannot be an alternative to a sole custody award where neither seeks it and where no opportunity is given to the recalcitrant parent to embrace the concept. Further, it is significant that the statute contains no additional subsection providing for a procedure in the event neither parent seeks joint custody." Id., 658. As neither party had agreed to joint custody or moved for conciliation after a motion had been made seeking joint custody, this court determined that the trial court's prospective joint custody award constituted error. Id.; see also *Cabrera* v. *Cabrera*, 23 Conn. App. 330, 346–47, 580 A.2d 1227 (citing *Emerick* in concluding that trial court properly determined that it could not grant joint custody without agreement of parties to joint custody or motion for conciliation following motion for joint custody by one party), cert. denied, 216 Conn. 828, 582 A.2d 205 (1990).

In a subsequent decision, this court construed *Emerick* as providing that a trial court is authorized to award joint custody when one of the parties has requested joint custody in the pleadings, provided that joint custody is in the best interests of the child. See *Giordano* v. *Giordano*, 9 Conn. App. 641, 645, 520 A.2d 1290 (1987) (citing *Emerick* in determining that "[w]hen one of the parties has sought joint custody in the pleadings, it is not error for the court, in the exercise of its discretion, to award joint custody"); see also *Keenan* v. *Casillo*, 149 Conn. App. 642, 647–48, 89 A.3d 912 (concluding that trial court had statutory authority to grant joint custody when plaintiff's complaint requested joint custody), cert. denied, 312 Conn. 910, 93 A.3d 594 (2014); *Tabackman* v. *Tabackman*, 25 Conn. App. 366, 368–69, 593 A.2d 526 (1991) (concluding that trial court improperly awarded joint custody without pleading requesting joint custody, agreement of parties to joint custody, or motion for conciliation following motion for joint custody by one party).

Relying chiefly on *Emerick*, the plaintiff maintains that the court did not have the statutory authority to award the parties joint physical custody when both parties sought only sole physical custody. This contention is unavailing. In *Emerick*, this court addressed a trial court's statutory authority under § 46b-56a to award joint *legal* custody, whether accompanied by joint or sole physical custody. *Emerick* v. *Emerick*, supra, 5 Conn. App. 656–57. Neither *Emerick* nor any other appellate authority of which we are aware interprets § 46b-56a to impose restrictions on a court's authority to award joint *physical* custody.

Indeed, a plain reading of § 46b-56a (a) reveals that the legislature sought to define a court's authority to

award joint *legal* custody, not joint *physical* custody. The final sentence of § 46b-56a (a) provides that "[t]he court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody." There is no similar language circumscribing a court's ability to award joint physical custody. As this court observed in *Emerick*, "joint physical custody is severable from joint legal custody." *Emerick* v. *Emerick*, supra, 5 Conn. App. 656–57.

In sum, we conclude that, under § 46b-56a, the court had the authority to award the parties joint physical custody notwithstanding that both parties sought only sole physical custody. Thus, the plaintiff's claim fails.

B

The plaintiff also asserts that the court, in awarding the parties joint physical custody, violated her rights to due process.[6] More particularly, the plaintiff asserts that, because neither party sought joint physical custody, she did not have fair notice that the court was contemplating a joint physical custody award or a reasonable opportunity to be heard regarding the propriety of a joint physical custody award. We are not persuaded.

This court previously has stated that, "although a court has broad discretionary authority when determining custody orders, it must exercise that authority in a manner consistent with the due process requirements of fair notice and reasonable opportunity to be heard." (Internal quotation marks omitted.) *Kidwell* v. *Calderon*, 98 Conn. App. 754, 758, 911 A.2d 342 (2006). "Whether a party was deprived of his [or her] due process rights is a question of law to which appellate courts grant plenary review." (Internal quotation marks omitted.) *Petrucelli* v. *Meriden*, 197 Conn. App. 1, 14, 231 A.3d 231, cert. denied, 335 Conn. 923, 233 A.3d 1091 (2020).

Our resolution of the plaintiff's due process claim is guided by this court's decision in *Kidwell* v. *Calderon*, supra, 98 Conn. App. 754. In *Kidwell*, the plaintiff filed a custody complaint seeking joint legal custody of the parties' minor child, liberal and flexible visitation rights, and " '[a]ny further orders that the [c]ourt and law or equity deems necessary.' " Id., 755. Following a custody hearing, which the trial court continued twice at the defendant's request, the court awarded the plaintiff sole custody. Id., 756–57.

On appeal from the custody judgment in *Kidwell*, the defendant asserted that the court improperly awarded the plaintiff sole custody when the plaintiff did not expressly request sole custody in his custody complaint or file a motion seeking sole custody, thereby depriving the defendant of due process. Id., 758. This court rejected that claim. Id., 758–59. First, this court noted that the trial court held a custody hearing, for which the court gave the defendant adequate time to prepare,

during which the defendant testified and had the opportunity to cross-examine witnesses, including a family relations counselor who recommended that sole custody be awarded to the plaintiff. Id. In a footnote, this court observed that the defendant became aware of the family relation counselor's custody recommendation prior to the custody hearing and, thus, was on notice that the trial court "would consider the possibility of following the . . . recommendation to award sole custody of the child to the plaintiff." Id., 758–59 n.2. Additionally, observing that the plaintiff's custody complaint requested "joint legal custody and any further orders that the court deemed necessary," this court stated that "[w]hen looking at the relief sought in the custody complaint alone, it is difficult to understand the defendant's contention that the court was limited, if at all, to making an award of joint legal custody. It is here that we must reiterate the principle that when making or modifying custody orders, the court's ultimate concern is determining the best interest of the child." Id., 759. This court proceeded to conclude that, in light of the evidence before it, the trial court properly considered the child's best interest in awarding sole custody to the plaintiff. Id.

Applying the rationale of *Kidwell* to the present case, we conclude that the court did not infringe on the plaintiff's due process rights in awarding the parties joint physical custody. Similar to the custody complaint at issue in *Kidwell*, the plaintiff's amended complaint requested not only that the primary residence of the parties' child be with the plaintiff but also "*anything else the court deems fair.*" (Emphasis added.) In her pretrial proposed orders, the plaintiff requested not only sole custody but also "[*a*]*ll such other and further relief both in law and in equity to which the court deems appropriate.*" (Emphasis added.) At trial, where custody was the primary contested issue,[7] the plaintiff testified, elicited testimony from a family relations counselor, cross-examined the defendant, and offered exhibits into evidence. On the basis of the evidence before it, the court concluded that it was in the best interests of the parties' child to award the parties joint physical custody.[8] Under these circumstances, particularly where the plaintiff herself requested broad relief from the court, we are not convinced that the plaintiff lacked fair notice and a reasonable opportunity to be heard as to the court's award of joint physical custody.[9] Thus, we reject the plaintiff's due process claim.

### III

The plaintiff's final claim is that the trial court abused its discretion in entering the physical custody orders because the orders were (1) based on inconsistent factual findings, (2) in conflict with the court's legal custody orders, and (3) not in the child's best interests. We disagree.

"[Section] 46b-56 provides the legal standard for determining child custody issues. The statute requires that the court's decision serve the child's best interests." *Altraide* v. *Altraide*, 153 Conn. App. 327, 338, 101 A.3d 317, cert. denied, 315 Conn. 905, 104 A.3d 759 (2014). "The controlling principle in a determination respecting custody is that the court shall be guided by the best interests of the child." (Internal quotation marks omitted.) *D'Amato* v. *Hart-D'Amato*, 169 Conn. App. 669, 683, 152 A.3d 546 (2016). Our Supreme Court "has consistently held in matters involving child custody . . . that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child [that] must control the decision of the court. . . . In making this determination, the trial court is vested with broad discretion which can . . . be interfered with [only] upon a clear showing that that discretion was abused. . . . Thus, a trial court's decision regarding child custody must be allowed to stand if it is reasonably supported by the relevant subordinate facts found and does not violate law, logic or reason. . . . Under § 46b-56 (c),[10] the court, in determining custody, must consider the best interests of the child and, in doing so, may consider, among other factors, one or more of the sixteen factors enumerated in the provision.

"[T]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] this court, but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of discretion can warrant our interference." (Citations omitted; footnote added; internal quotation marks omitted.) *Zhou* v. *Zhang*, 334 Conn. 601, 632–33, 223 A.3d 775 (2020).

In entering its custody orders, the court made the following relevant factual findings. "The plaintiff has done a good job of caring for [the child] since his birth . . . . Doctors' information reflects the good health of the child. With limited information, Family Relations found that both parties were good and capable parents. The Family Relations' representative indicated that the role of the main custodial parent as gatekeeper to foster the relationship between noncustodial parent and child was critically important. In regard to this issue, Family Relations was not aware that the plaintiff referred to the defendant as 'pure evil,' 'not good for [the child's] soul,' and a 'horrible human being.'

"Family Relations recommended that the child physically reside with the plaintiff. In doing so, Family Relations did not have access to some of the evidence, which reflects the court's greater substance abuse concerns[11] although the Family Relations' representative did speak to the plaintiff's brother's wife who said that she had

observed the plaintiff drinking and had concerns about the plaintiff's substance abuse. The Family Relations' representative discounted this information because of her concerns that the plaintiff's brother's wife was biased against the plaintiff.

"The plaintiff's concerns with the defendant as a father were that the defendant had unaddressed mental health concerns, [had] a history of abusing alcohol, worked frequently, and had a busy social life. [The plaintiff] also complains that the defendant did not show any interest in the child during the gestational period. The court finds [that] the defendant's explanation for his lack of contact with the plaintiff during this period [is] reasonable, namely, that the plaintiff refused to allow him to contact her during this period and he was concerned that he not upset the plaintiff. It is clear from the evidence that in January, 2018, the plaintiff insisted that the defendant not contact her at all. In regard to the plaintiff's other concerns, there was no evidence that the defendant had unaddressed mental health issues. He admits to a distant history of abusing alcohol but indicates that he has not consumed alcohol for over twenty years. There is no evidence to the contrary. The court concludes that the defendant does not have any significant substance abuse issues. It appears that he does have work responsibilities, which frequently interrupted communications with the plaintiff. Finally, the court makes no findings in regard to his social life, there is no evidence regarding a 'busy social life.' Ultimately, there was no evidence to support any of the plaintiff's stated concerns. The information obtained by Family Relations and the credible evidence in this case presents the defendant as an able father.

"On the other hand, the court did have concerns about the plaintiff's substance abuse issues based upon the credible evidence in this case. The court has tried to examine all of the evidence to determine what would be in the child's best interest.

"One of the factors that the court considers in deciding the appropriate custodial arrangement for the child is how likely the residential parent is to foster the relationship between the child and the nonresidential parent. The court finds that, short of specific court orders, it is unlikely that [the plaintiff] will foster the relationship between the child and [the defendant]. . . . This conclusion is based upon substantial evidence in the proceeding. For example, [the plaintiff] viewed [the defendant] as 'pure evil' and 'a horrible human being' and as someone that she did not want to have contact with her son. She ended communication between herself and [the defendant] approximate[ly] three months prior to the birth of their child. She did not consult with [the defendant] in naming the child and did not give the child [the defendant's] last name. Her attitude toward the [defendant] in her testimony and in her text

communications [that were admitted into evidence] relays a clear hostility toward the [defendant]. To her credit, she has communicated with [the defendant] since the birth of the child through the Internet and phone regarding the child and there has been regular video contact. On the other hand, [the defendant] has visited with the child multiple days on three separate periods of time from the child's birth in April, 2018, through the end of December, 2018, and [the plaintiff] has never allowed [the defendant] to have more than one hour [of] visitation during any daily visits. During the initial visit, [the plaintiff] denied [the defendant] visitation until the court was involved." (Footnote added.)

Additionally, the court found that the defendant "has an adequate housing and 'day care' system in place for his son when his son lives with him in Saskatchewan. He is capable of caring for his child. He participated significantly and substantially in the raising of other children in the past.[12] He indicated that his sixty-eight year old mother, who is currently watching a three year old and a seven year old, is also available when [the defendant] has work responsibilities [that] would prevent him from watching his son." (Footnote added.)

We first address the plaintiff's contention that the physical custody orders were predicated on inconsistent findings. In particular, the plaintiff contends that the court's finding that, without court orders, she was unlikely to foster a relationship between the defendant and the child is inconsistent with its finding that the plaintiff facilitated contact between the defendant and the child following the child's birth. We are not persuaded. The court's finding regarding the plaintiff's inability to be an adequate gatekeeper promoting a relationship between the defendant and the child was grounded in "substantial evidence" demonstrating that (1) the plaintiff harbored "clear hostility" toward the defendant, whom she described as " 'pure evil' " and " 'a horrible human being,' " (2) the plaintiff terminated communication with the defendant shortly before the child's birth and limited the defendant's in person interactions with the child, and (3) the plaintiff did not consult with the defendant when naming the child. We perceive no inconsistency in the court making the reasonable determination that, although the plaintiff had communicated with the defendant about the child following his birth and maintained regular video contact, the totality of the evidence established that, without court intervention, the plaintiff was unlikely to foster a relationship between the defendant and the child.[13]

We next turn to the plaintiff's contention that, by ordering that the child will reside with the defendant regularly during the time when the child's residence alternates between the parties, the court made it impractical for the plaintiff to exercise the final deci-

sion-making authority granted to her vis-à-vis the court's legal custody orders. We are not persuaded. The court's legal custody orders require the parties "to discuss and work together" in making all major decisions concerning the child, with the plaintiff having final decision-making authority if no agreement can be reached. We are unconvinced that the physical custody orders hinder the plaintiff's ability to communicate with the defendant in relation to those major decisions and, if necessary, to assert her final decision-making authority.[14]

Further, we address the plaintiff's contention that the physical custody orders were not in the child's best interests. The plaintiff posits that the orders create an unstable environment for the child, inhibit the development of consistency with respect to, inter alia, the child's medical care and social activities, and, during the years when the child's residence alternates between the parties, wholly deprive the child of physical interaction with the nonresidential parent for months at a time. The plaintiff further maintains that she has a greater ability to care for the child than the defendant.

We iterate here that the trial court is conferred with the authority to exercise judicial discretion under § 46b-56, and "[n]othing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *Zhou* v. *Zhang*, supra, 334 Conn. 633. We have no such conviction in this case. As the court stated, its custody orders were fashioned with the best interests of the child in mind and to address a "difficult situation [in which] the parents of a young child live in two very different and geographically diverse places . . . ." The court found that the defendant was an "able father," that the plaintiff's concerns with the defendant's ability to parent were not supported by the evidence, and that the defendant had "an adequate housing and 'day care' system in place" for the child. The court also found that the plaintiff had "done a good job of caring" for the child, although it expressed concern regarding the plaintiff's substance abuse issues and did not believe that she would function as an adequate gatekeeper fostering a relationship between the defendant and the child. Weighing all of the evidence before it, the court determined that the physical custody orders it constructed were in the child's best interests.[15] In light of the record before it and the unique circumstances presented by this case, we cannot conclude that the physical custody orders entered by the court constituted an abuse of discretion.

Finally, we note that "§ 46b-56 provides trial courts with the statutory authority to modify an order of custody or visitation. When making that determination, however, a court must satisfy two requirements. First, modification of a custody award [must] be based upon

either a material change of circumstances which alters the court's finding of the best interests of the child . . . or a finding that the custody order sought to be modified was not based upon the best interests of the child. . . . Second, the court shall consider the best interests of the child, and in doing so may consider several factors. General Statutes § 46b-56 (c)." (Internal quotation marks omitted.) *Peters* v. *Senman*, 193 Conn. App. 766, 778, 220 A.3d 114 (2019), cert. denied, 334 Conn. 924, 223 A.3d 380 (2020). "Section 46b-56 permits a court to modify child custody and visitation orders at any time." *Perry* v. *Perry*, 130 Conn. App. 720, 724, 24 A.3d 1269 (2011). Thus, in the event that either party maintains that a material change of circumstances has occurred, such that a modification of the court's custody orders would serve the best interests of the child, either party has the ability to move to modify the court's custody orders.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court entered other orders in dissolving the parties' marriage, none of which is at issue on appeal.

[2] On April 15, 2019, pursuant to Practice Book § 61-12, the plaintiff filed with the trial court a motion for a discretionary stay of the custody orders during the pendency of this appeal, which the court denied on June 19, 2019. On July 1, 2019, pursuant to Practice Book §§ 61-14 and 66-6, the plaintiff filed with this court a motion for review of the denial of her motion for a discretionary stay. On July 24, 2019, this court granted the motion for review but denied the relief requested therein.

[3] The plaintiff limits her claims on appeal to the court's physical custody orders. She does not challenge the court's award of joint legal custody.

[4] The plaintiff also cites *Stahl* v. *Bayliss*, 98 Conn. App. 63, 907 A.2d 139, cert. denied, 280 Conn. 945, 912 A.2d 477 (2006), to support her claim. In *Stahl*, this court concluded that the trial court had erred in incorporating a stipulation, executed by the parties in 2003, regarding custody and visitation, into its dissolution judgment, rendered in 2005, without considering the present best interests of the parties' minor children. Id., 69–70. In the present case, the trial court considered the child's present best interests in entering its custody orders. Thus, we do not consider *Stahl* to be germane here.

[5] In discussing the time period during which the child's residence alternates between the parties, the court referred to this time frame as a "period of shared custody . . . ." We do not construe the court's use of the phrase "shared custody" as demonstrating that the court intended for the parties to have joint physical custody *only* during that specific time frame; rather, it is reasonable to infer that the court was referencing the approximate equal split in time that the child was residing with each party during that time period.

[6] "We analyze the [appellant's] due process claim under the federal constitution only because [the appellant] has not provided an independent analysis of an alleged due process violation under the state constitution. See *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 694 n.8, 167 A.3d 351 (2017), cert. denied, U.S. , 138 S. Ct. 2583, 201 L. Ed. 2d 295 (2018)." *Petrucelli* v. *Meriden*, 197 Conn. App. 1, 13 n.8, 231 A.3d 231, cert. denied, 335 Conn. 923, 233 A.3d 1091 (2020).

[7] In its decision, the court stated that "[t]he main issue at dispute in this action is the custody of the minor child."

[8] In part III of this opinion, we address and reject the plaintiff's claim that the court's physical custody orders were not in the best interests of the child.

[9] We recognize that this court in *Kidwell* stated in a footnote that, prior to the custody hearing, the defendant was sufficiently put on notice that the trial court would consider awarding the plaintiff sole custody on the basis that the defendant had learned of the family relations counselor's recommendation that sole custody be given to the plaintiff. *Kidwell* v. *Calde-*

*ron*, supra, 98 Conn. App. 758–59 n.2. We do not construe this court's disposition of the defendant's due process claim in *Kidwell* as hinging on the defendant's discovery of the family relations counselor's custody recommendation.

[10] General Statutes § 46b-56 (c) provides: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision."

[11] Earlier in its decision, the court stated that "upon the credible evidence in this trial the court is concerned about the plaintiff's dependence on [intoxicating] substances." The court found that the plaintiff (1) used cocaine recreationally between October, 2012, and February, 2017, (2) took prescription medications " 'off and on' " while pregnant with the parties' child in contravention of the direction of a health professional, (3) smoked cigarettes during the first sixth months of the pregnancy, and (4) consumed alcohol frequently and to excess. In making its findings concerning the plaintiff's substance use, the court credited the defendant's testimony on the subject while discrediting the plaintiff's testimony. The court further found that "[the plaintiff's] disregarding the health of her unborn child concerns the court. It also supports the defendant's position that the plaintiff has a substance-dependency issue." The court credited the plaintiff, however, for agreeing to a "cursory testing for illegal substances of which she tested negative for all illegal substances."

[12] Earlier in its decision, the court found that the defendant helped raise two children of a prior spouse and has an adult daughter who lives with him.

[13] The plaintiff also asserts that the court's finding that, without court orders, she was unlikely to foster a relationship between the defendant and the child is inconsistent with the court's orders granting her final decision-making authority over major decisions involving the child and designating her residence as the child's primary physical residence for the bulk of the child's minority. As the court observed in its decision, however, the likelihood of the plaintiff fostering a relationship between the defendant and the child was but one factor it considered in constructing the custody orders. The court weighed all of the evidence before it and considered the best interests of the child in entering the custody orders. Thus, we do not agree with the plaintiff that an inconsistency exists.

[14] We note that, to assist the parties in carrying out the custody orders, the court ordered them to engage in co-parenting counseling with a licensed counselor for one hour every month for the first six months following the

dissolution and for one hour every two months for the following year.

[15] General Statutes § 46b-56 (b) provides in relevant part that "[i]n making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child *and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. . . .*" (Emphasis added.)

We also note that, on the final day of trial, following closing argument, the court discussed with the parties its intent to enter interim orders pending the issuance of its dissolution judgment. During that discussion, the court stated that it was "important to the court . . . that the [defendant] start a normal—I mean, it's very difficult to have a normal relationship with someone when you're living so far away. But it's important . . . that [the defendant] gets started in having a relatively normal relationship with the child. The child is still very young [and] probably won't remember anything that's going on right now."